Good morning, I'm John Rhodes from the Missoula Office of the Federal Defenders of Montana. I represent Jose Ambriz. Good morning. Relevant here, section 1326A criminalizes an alien who is at any time found in the United States. That's the statute that the court has to interpret. The statute's written in the disjunctive though, correct? Correct, Your Honor. There are three crimes listed in 1326. He was charged with the found in, right? Correct. It was a little confusing. I'm sure the court's aware. The government originally charged something in the indictment that didn't mirror the language in the statute. At trial, it clearly adopted the found in allegation. If he had been charged with attempting to enter, it seems to me that the arguments that you're making would have been stronger as to that. What is the distinction between being charged with found in and attempting to enter? What are the differences in the consequences to someone? No one really fleshes that out. I think the consequences with respect to sentencing are largely the same under the guidelines in the statutory penalty ranges. With respect to the criminal liability, a huge distinction is attempt is a specific intent crime. This court in an en banc case ruled that way. That would be a big difference between the two offenses in terms of what the government would be burdened to prove. I think the government here, I know they conceded several times to the district court that it could not prove attempted to reenter. That's why the government, I believe, adopted a found in. So the statute allows for different, you know, that they are in the disjunctive. So they're clearly not exactly, you know, if it were only one crime, they wouldn't be in the disjunctive. And you say that you should have gotten an instruction on official restraint? Yes. Now the cases that you argue where official restraint applies, weren't those all where the person was attempting to enter? That is incorrect, Your Honor. The facts may have supported in an attempted reentry allegation in those cases, but Cruz-Escoto, Zavala, both of those cases were found in cases. The government claimed to the district court, represented to the district court that the cases we were relying on, and our theory of defense instruction was an exact quote from those cases. The government represented that those were attempted reentry cases. If you go and look at each of the cases, you'll see they were found in cases, interpreting the phrase found in. I don't see how this fellow could have entered or reentered the United States legally, because he never left the United States as a matter of law. They wouldn't let him into Canada. That goes to the core issue here, and that's why I cited what the language of the statute is found in the United States. He was deported, and you aren't contesting the deportation. Correct, back in the 90s. And you didn't put on any evidence at the trial of any problems with that? We put on some evidence, but we're not advocating those issues on appeal. Okay, so if he had been, let's say if he had been found at his house. Okay. Inside the United States. In the United States, then you couldn't make any of these arguments. I think he would have pled guilty, Your Honor. Well, I know. But yes, we would not make those. Okay, so you're making these arguments because he's close to the border, right? He's on the Canadian side of the border is our position. Oh, wait a minute. He's not on the Canadian side of the border. He's on the Canadian side of the U.S. Customs post. That's more accurate, Your Honor. He's at the border. Yes, he's at the Border Patrol Customs port of entry, returning from Canada where he was refused entry. Legally in the United States, and maybe geographically in Canada. I don't know. I don't see how you can enter the United States if you haven't left it. That's our point, Your Honor, is that in, found in, has a very highly technical, historically derived definition. And you are not in the United States, for instance, when you're at a border situation, until you clear customs. Well, if you attempted to leave and you couldn't leave, and the reason they're talking to you at the border station is because you came back, I'm not sure why that's any different than being found in your home. Because at that point, he's under official restraint. He was returned from the Canadian officials. And the government agrees that's when he was found, when he was rejected by Canada and returned to the American Customs Border Patrol. Does it matter that he had not been under official restraint for however much time he was here previously? Does that matter? It matters because during that period, he was not found by law enforcement officials. So, yes, that does matter. There's nothing for the jury to look at but for the fact that he'd just been here all that time, and then he's trying to go to Canada. The government agrees in its brief that the evidence focused on what happened at the border that day. So what was presented to the jury did not span the many years that it appears that Mr. Ambrose was in the United States. And, again, when he was found, he was in under official restraint. Are there any nine circuit cases directly on point on this? There's nothing directly on point. I would say the Hernandez case is our strongest case. Zavala is another case that strongly supports us. I think an out-of-circuit case, actually, it's a district court case from the Southern District. Ayala? Excuse me? The Ayala case. Yes, that also supports our position. Did you ever cite that? Because it seems to me that I just found that recently and not because you told us. I was mistaken, Your Honor. I believe I cited the Arilla case, not the Ayala case, but I believe that's cited in the Hernandez case. There's a case from the Southern District of New York, Thomas, that tries to look at this area of law, which is very complicated, and I think that case strongly supports us. Those cases are in the context of someone who's trying to come into the United States initially. That's where the official restraint doctrine originally came into our. . . That's where it developed, Your Honor. That's where it developed. So this is a little different than the cases that really developed that idea. It's different going back to the child shock case from over 100 years ago. It is different, but the bottom line is that he was under official restraint when he was found. Well, did the Canadians escort him back to the American Border Station? The record is not developed. I believe what happened is the Canadian officials radioed back or telephoned, however they communicate, between the two posts and said, We're sending somebody back. Did they watch him from the time he left until the time he got back to the station? Was somebody tracking him? Yeah, the testimony was that Officer Steffi, who was at the primary inspection post, saw the car coming from about a quarter mile away. I'm going to reserve the rest of my time for rebuttal. Thank you, Your Honors. Good morning, Your Honors. May it please the Court, my name is Tim Roscoe, and I'm an assistant U.S. attorney in the Missoula branch office in Montana. I was not trial counsel in this case, but I am obviously counsel of record on the appeal. Well, tell me this. I mean, the statute's in the disjunctive, and as far as I can tell there's nothing on the found in part of it that exactly answers the questions that we're coming up with here. If you had charged him with entering, would his arguments be stronger? Well, we couldn't have charged him with entering because he'd never completed the entry. If we had charged him with attempting to enter, I think his arguments would be stronger because we would not be able to prove that Mr. Ombres had the specific intent to come back into the United States because Mr. Ombres had Never left. I'll ask you the same question. I don't understand how he can enter the United States if he hasn't left it. And he couldn't leave it because the Canadians wouldn't let him into Canada. That's our point, exactly. Back to the United States. Now, why is that an entry into the United States? It's our view that it's not, and that's our point exactly. And also, so we can't prove that he was attempting to enter because he never left. That's certainly our view. If you were to conclude that his brief physical presence in Canada matters, then we're over that hump. But we can't prove specific intent because he has no choice but to turn around and come back and encounter the U.S. Border Authority. So he's not intending to go anywhere in Canada. But he was geographically in Canada, I assume, because the Canadian border post is inside Canada. But he wasn't legally in Canada, I don't believe. They wouldn't let him in. That is our position, Your Honor. And to me, that is really the issue in this case, is whether his brief physical presence on Canadian soil matters. Counsel, what's your response to opposing counsel's argument regarding official restraint? That entire body of official restraint cases are important from the government's perspective because they assert the exact proposition that we do, that physical presence doesn't matter. The whole point behind official restraint, and I believe one of those cases, the individual, the illegal alien, is actually eventually encountered or confronted or taken into custody in Utah. And the government charges a founding case, as you and Mr. Rose discussed, Judge Callahan, and they're wrong in that because he was surveilled continuously from the time he crossed the border until the time he's apprehended in Utah. So he's officially restrained based on that body of law the entire time, which proves our point that physical presence all the way up to Utah, well within the contiguous 48 states, makes no difference in terms of the analysis of the issue. Well, are you familiar with the case of the United States v. Ayala? Just vaguely, Your Honor. I basically read the entire body of cases and formed our argument based on those. What is the purpose of the official restraint condition? Why is that in these decisions? What's it all about? The purpose behind it in terms of its relationship to founding, Your Honor, I honestly don't know. I mean, it's just a bunch of words. We don't know why they're there. I mean, other than that you can draw a conclusion that if we're watching you the entire time and we can grab you up whenever we want, you can't technically be found here. It just to me seems in essence. You're not officially entered because the officials can swoop down on you at any time and take you. So that's the premise is you've never officially entered because you're not free to go about your business. You've never completed your entry. I would agree with that. That's exactly right. You've never completed your entry. Well, the found in line of cases that in the evidence at trial is he's deported. You know, that all comes in. He doesn't challenge that he was deported. So there really isn't an issue that he's removed at some point. And then all we know is he's here and then caught at the border. They don't let him go into Canada.  And up to that point he's not under surveillance, right? Correct. So you're just saying that the implication is that, well, obviously to get, you know, he had to be here to get to the border. Correct. And that there's some evidence in the record of that. So that's the found in? That's the found in. He tells the officers once he's at secondary on the U.S. side when he's been rejected by the Canadian authorities that he was going to Canada for a medical procedure. The officer thought he called it was an eye surgery. So he says, I'm going to Canada. So he has to be going to Canada from somewhere. And the implication is that he's going from the United States. He also tells the investigating agent when she's transporting him down to his initial appearance at court that he's tired of being illegal in this country and tired of hiding. That was basically the gist of the evidence that was presented to the jury on the issue of where he was before he got to the border. Well, opposing counsel represented that the case didn't focus on his prior stay within the United States. Would you agree with that representation? I think that's right. I think the focus of the case was really when he's encountered by the officials that testified at trial, which are the U.S. Customs and Border Protection officials at the U.S. Port of Entry. So are you staking the conviction on whether or not he was actually, he left the United States? Is that what you're staking your case on? I think that's a fair statement, Your Honor. The real question is does it matter whether he's physically on Canadian soil for those few moments of time or does it make any difference at all? And I guess the one thing I would say about that is the first Border Protection officer that testifies says, I think in response to a question on Cross, we didn't have any interaction with this individual when he left the United States, i.e. when he approached the Canadian side of the board of the Canadian authorities. We do have the ability to do outbound border checks, but we weren't doing them that day. And I don't know if they're ever doing them, but they at least were not doing them that day. But what evidence is there that he was anywhere but the United States? There's none. And what if they had been doing the outbound border checks that day? He would have confronted the same border officials in the same place, but he would not have physically been on Canadian soil for 10 or 15 minutes before he was turned around. So that's where, to me, the question comes back to, does it make any difference that he's physically standing foot on Canadian soil for a few minutes? And it's our position that it does not because he didn't legally leave, so he's not attempting to come back in. So the prior restraint body of cases help us in the sense that they confirm that physical presence somewhere doesn't control. You can be all the way in Utah and still not have completed your entry. You're still not found in the United States. So we had no choice but to charge Mr. Ombrice as being found in the United States. He never left the United States in the first place, and the only evidence in the record is that he was in the United States free from official restraint for some period of time, at least before he approaches the Canadian authorities. Unless Your Honors have further questions, I'll stand on the briefs. All right. Thank you, Counsel. Thank you very much. Thank you, Your Honor. With respect to that last point that the government felt it had no choice but to charge found in, there's a third option in the statute, unlawful reentry. That's distinct from attempting to reentry. Well, how could there be unlawful reentry if he never legally left? It could have gone, take February 28th and just forget that day. It could have gone backwards in time and put together a case that Mr. Ombrice was previously removed from the country, returned without permission, and we have this body of evidence to show that he reentered the country. Excuse me. It could have made that case. So the government – He reentered the country after deportation to try to show that he had been in the country when he was – Years and years ago, all before this border situation. That option was available. So the government was not in a we have no choice but to charge this situation. What do you think the purpose of having this official restraint condition applied here? Why is that? What's the purpose behind it? It does go back historically, Your Honor, that you are not in the United States until you are free to move with the general population. And so until you clear customs, which I think we've all experienced when we've traveled internationally, technically, legally, under the law, you are not in the United States. Well, then it would seem to me it would necessarily apply to an entry situation but not to anything else. Well, that's why the phrase is found in is so important. It's not was we found out about somebody who was here, who was in the country, is found in. Counsel, your argument then would mean that he never went to Canada, so that he never left the United States. If you're not in a country until you clear customs and he never cleared customs in Canada, then he was never in Canada. Well, under the law, Your Honor, there's this third place in space where you're not in Canada, you're not in the United States, you're at the border. And it's not something that we think about in a common sense way, but it's something that the law has developed. And that's where Mr. Ambrose was when the government found him. So if he was at the border, what does that mean for legal purposes? If he's at the border, he was not in the country when he was found. He was not in the United States and he was not in Canada. Correct. Physically in space he was, but according to law he was not. Well, the problem that I'm having with your facts is that there's no evidence that he was anywhere but in the United States before he went there. And you didn't present any evidence. In fact, there was evidence to the contrary that he had been here illegally all that time. Well, that's why the words of the statute are so important, is found in. When the government found him, he was not in the country free from official restraint. Another point I'd like to make is I've briefed extensively the fact that we should have gotten a theory of defense instruction. I think the argument this morning shows that a jury is not going to understand found in, and we should have gotten an instruction on that. We should have also gotten an instruction on time and place because the government was very specific in its allegations, very specific in the evidence it presented, and the court refused to give us either of those instructions. And under the law of the circuit, that's reversible error per se. All right. Thank you, counsel. You've exceeded your time. Thank you to both counsel. The case just argued is submitted for decision by the court. The next case on calendar for argument is United States v. Red Star. Please proceed, counsel. Thank you, Your Honors. My name is David Ness. I'm with the Federal Defenders of Montana, and I represent Marlon Red Star. As the court may be aware from a review of the record, Mr. Red Star was charged in May of 2007 for a crime that was allegedly committed two years prior to that in the summer of 2005. There is no statute of limitations issue. No, there is no statute of limitations issue. But I bring that up together with other facts regarding procedural and evidentiary history because I think it's important when the court reviews the allegations of error with respect to the trial. This was a case that was essentially a he said, she said. There was no physical evidence. There were no other witnesses aside from the victim and Mr. Red Star. So it's a classic case of who the jury believed. It is a classic case, and so that's why it is so important in reviewing Mr. Red Star's allegations with respect to trial error. And going beyond that, how important it is in assessing the potential prejudice to Mr. Red Star. Well, let's go right to the statement of the, was it the sister-in-law? Yes. All right. Now, my understanding of the chronology of events is that the alleged victim testified, was cross-examined, and in the cross-examination,  all of those things and that the time had gone by. Then after her, that's when the sister-in-law was put on to testify, that she immediately reported that the day after she reported to the sister-in-law the event that she had been forcibly attacked. All right. So, but there was no objection at that time. So we have no, you know, the district court isn't asked to say, was this an excited utterance? Was it a prior consistent statement or anything like that? So we have to look, we're looking at it from a plain error standpoint. That is correct, yes. It seems to me, even though I don't think that the appellees are really arguing this, it just seems the classic prior consistent statement. The whole theory of the defense was it happened, but it was consensual, that she's not remembering any of those things. The fact that the day after it happened, she reports it to her sister-in-law in terms of that it's forcible and all of that, and it's the day after, as opposed to X number of, you know, the long passage of time, why doesn't that come in as a prior to rehabilitate the witness? Well, it doesn't come in as a prior consistent statement, and Judge Callahan, as you may have noticed, the government and I were kind of arguing past one another. Right. I initially considered, when I first looked at it, I thought the government must have been thinking consistent statement. Well, defense counsel wasn't thinking? If it was, there was no objection. Well, I'm not trial counsel, so I can't. So you can say that. I can't say. But it's not a consistent statement, because consistent statement, the bedrock premise of a consistent statement is that there must be a motive to fabricate or testify falsely, and that motive must have arisen after the prior consistent statement was made. And here, the defense did not attack the victim's credibility based on intellectual motive. Well, it certainly did. It certainly did in terms of that she doesn't remember whether it was consensual or not, that there had been alcohol, the passage of time, all of those things. I mean, you've got to rehabilitate that witness, and what she said one day after it happened, when the defense is trying to prove that X number of years down the line, you know, she's a young woman, she doesn't remember, she'd been drinking, all of those things. What she said one day later is really important as to her credibility. Judge, and everything you named off is classic impeachment, but it's not impeachment insofar as she had a motive to lie about it. And the cases, if you read the cases, they make a distinction about that. Prior consistent statement isn't just a general rehabilitative tool. It's only used when you say, hey, witness, you had a reason to lie about X, and that's why you lied about it. So then the proponent of the consistent statement gets to bring in a consistent statement to show, wait a minute, the witness was making consistent statements about this event before there was ever an allegation, the motive to lie arose. And here if you – there was no cross-examination or evidence presented that when the statement was made to the sister-in-law that NR, the victim, had a motive to lie at that point. It was all just you were drunk, you don't remember, you're young, those sorts of things. And so that's why it's not – that's why it is not a consistent statement. Did the government argue it was a consistent statement, prior consistent statement? No one said anything because you didn't know when – it just came in. I mean, even after – even during the briefing on appeal, the government's never argued that this was a prior consistent statement. No, and Ms. Sewick can correct me if I'm wrong, but as I understand her brief, she came back and said we were trying to introduce this as an excited utterance, not – Didn't Red Star admit to the crime in the witness stand? Your Honor, he was charged with two offenses, one being a forcible rape, if you will, and the other one being a statutory rape. He admitted to the statutory rape. What he always denied, however, was that he committed any sort of forcible rape. Well, does it make any difference? It does make a difference. There are two separate crimes. Well, there was evidence, though. In fairness to all the evidence and all the inferences, he did make a statement prior to trial that would indicate that, yeah, if he hadn't been so drunk, maybe he did say no or something, but he would have been better able to gauge the fact that she was resisting him if he hadn't been drunk, right? So that certainly, I think, put a little nail in the coffin on him on the forcible rape. Well, of course, that then gets into the second allegation of error. He did make a statement to the FBI, and he testified that he went in and he spoke to this FBI agent for an hour, hour and a half, and then at the conclusion of the interview, the FBI essentially asked him a series of leading questions, leading him through, and she said no, blah, blah, blah. And it was in that context that this admission was made. When he testified at trial, Mr. Redstar said, essentially, I was scared. He was leading me through things. He had twisted my words around. I just wanted to get out of there, so I made this admission. And that's he said he said. No, but at trial he admitted to having sexual intercourse with a minor, did he not? He did. That's what he's charged with, isn't it? No, Your Honor, he was charged in two counts, one being aggravated sexual abuse through use of force. That's count one. That's the more serious charge. And he was then charged with sexual abuse, which is essentially statutory rape in count two. He did, and I don't think that we can contest the evidence with respect to count two, because he did make that admission. Yes, I had sex with this girl. I had reason to believe she was under the age of consent. But it's with respect to count one that he's always denied and that the evidence here goes to. And so what we are asking for. Well, we have to look at the evidence. When you say he's always denied, there was evidence at trial that he didn't always deny the forcible part of it. So we have to look at when we assess if there's error, even under the plain error, we have to look at all the evidence and all the inferences that can be taken from the evidence, correct? Well, you are. So there is some evidence that a jury could have believed that he admitted, you know, whether they believe the agent, whether they believe your client at the time that the statement was, and whether they believe the young woman, whether they believe him. And that's where I think it gets us into the second issue. And then, of course, you have the prior victim, too. There was no prior. Oh, that was it. We had another. I'm sorry. Another case with a prior victim. To my knowledge, there's no prior victim. The other case had a prior victim. I think I read the transcript. No, sorry. But that's when the court allowed replay of that small portion of his interview with the FBI and didn't, that was over his objection, but didn't then also allow a rereading, if you will, of Mr. Redstar's testimony, explaining why he may have made that admission when the FBI agent was leading him through. Well, if a jury just says, the jury heard all the evidence, right? Correct. And so when they're delivering, if they just want to hear one part of it, that doesn't mean that they didn't hear the other part as far as, but is there any case law that says you have to force them to hear everything when they only want to hear part of it, that they've got a question about part of it? Well, the case law out of this court, Richard, Binder, those kinds of cases state that generally whether or not to replay testimony is within the court's discretion. But if it's going to do so, it has to make sure that you don't take snippets of testimony without contextualizing it, without also letting the jury hear opposing or contrary testimony. Counsel, what was your point? I mean, the entire summary was replayed. So there wasn't just a snippet of the summary. They asked to hear the summary of the confession, right? Isn't that what they asked to hear? That's what they asked to hear. Now, what are you saying should have been included with that, his entire testimony? No. There's four or five pages of testimony, I think it's on pages 115 to 119 of the excerpts of record, where during direct examination he explains why he made those admissions to the FBI agent. And he explains about what that interview was like and how he was led through leading questions to make those admissions. But the district court did caution the jury that just because that part was being played didn't mean it should be emphasized more than any other part. So the district court followed our instructions on how to replay. So what case most strongly supports your argument that this was abuse of discretion? Well, I think in Binder this court said that partial readbacks are viewed with disfavor. In Richardson, or Richards rather, they talked about just having that one witness's testimony. Well, Binder was failure to replay a tape. There was a tape, and the court played part of the tape and not all of the tape. But that's not what we have here. Well, I guess depending upon how you look at it, because it was the entire tape. Or testimony in addition to tape. In Binder it was a part of the tape as opposed to all of the tape. So that was a little different. Right. Yeah, a little different. But the cases generally say you've got to contextualize this stuff. You can't, you know, I mean. You have to have a stopping point. Because you can say, okay, then if you play the part where he talks about how the interview was, then we have to pay the agent's testimony regarding how the interview was. And you could go on and on. The court has to make some kind of ruling regarding where the stopping point is. Or otherwise you have the whole trial reread to the jury. And that's true. And that may have been a problem initially with even allowing the replaying of this tape. It was a one-day trial. That's why we vest the district court judge with discretion. He's there. He's looking at all of the evidence. He's reading the jury. He's reading the defendant, the judges. So that's why we defer to the district court judge's discretion. Because he's there and he can read the way the trial is going much better than we can. You do. And, you know, I wouldn't argue with you, Judge, that there needs to be a stopping point. But here we're talking about four or five pages is what we're talking about. Even if you included the agent's testimony, I didn't count that. But as far as this interview is concerned, you would probably add another maybe ten. We're talking less than 15 pages in total to contextualize and put this what can only be considered damning. That's why we refer to it as confession statement that he made to the FBI. But to contextualize it so that the jury doesn't place undue emphasis just on those single words. Did she say no? Did you force her? I think I'm out of time, Judge. We'll give you a minute or two for a bottle. Good morning again. Laurie Suk for the United States. I was trial counsel. I'm counsel on appeal as well. I would like to start with the last issue first. This was a one-day trial, including verdict. So when we're talking about replaying an exhibit, this is not an entire testimony issue like in Binder or Richards where there was testimony reread or replayed. This was one exhibit that was introduced into evidence. It was an audio tape, right? It was an audio tape. There was no request for any more testimony. The objection was undue emphasis at trial. There was no request. So that issue has to be reviewed, if anything, for plain error. There was no request by the defense for additional testimony. But it was in the context of a one-day trial where the jury had just heard all of the evidence, including the defendant's version of events. We do disagree with the characterization of this case as a classic he said, she said, because the defendant at trial contradicted his own prior-to-trial statement that was on tape. And to call it just leading, certainly if you listen to the tape, it is leading questions, but it was a summary. The agent testified that he had talked to the defendant, the defendant had made these statements, and then he put a summary of that testimony on tape. And the jury was able to assess the agent who testified about what the defendant told him, specifically that the defendant said, I heard her say no, I would have stopped if I wasn't so drunk. So it's not a classic he said, she said. The victim was supported by the defendant as well, the tape, as well as the agent's testimony of his prior statement. Moving to the other issue. Judge Callahan, I probably know what you're going to ask me. I was concerned as well about the cases on motive to lie. And that is why the government, at trial, I did not introduce this as a prior consistent statement. I did not know what the cross-examination would be. Well, you just called her. I just called her. And no one objected. And prior to trial, I believed I could establish it was an excited utterance because of what the sister had said and what the victim had said about the fact that she got home late, she had been drinking, she was upset, she was scared, crying. And the statement was made the following morning. It was. It was a long time to get calmed down. But timing, Your Honor, is not everything. And in this situation, we have a... Do you know another case where there's that much time has elapsed? Well, U.S. v. Farley, an out-of-circuit case, was a child sex abuse case where a disclosure was made the next day. Yes. All right. Did the sister-in-law ask her questions before she made the disclosure? Yes, one question. She said, what is wrong? All right. So that also cuts against you in the sense that it's not the alleged victim blurting it out. It is. But then this circuit has the people versus... Let me grab that case. It's in my brief. There is a case in my brief about the fact that that doesn't settle the question as to whether it's in response to questioning. Certainly that is a factor to consider, though. But the district court wasn't given the opportunity to do any of this. Well, so because no one objected, it just came in. And now we're looking for plain error. And essentially our job then is to look through the entire evidence code and decide if there's any way it could have come in. Or then just if then if you say, well, it was, we don't know, maybe it was error, but then look at all the evidence and decide how did it affect the proceedings. That's the position you're putting. The case is People of Territory of Guam versus Sepeda. That's a 1995 Ninth Circuit case that specifically says it does not matter that the statement is made in response to questioning. And that is the position you're put in. We believe that it could come in as an excited utterance because there is case law that supports it. Timing is an issue here as well as response to questioning. But still in all, there is cases of support that's coming in. But even if it was error, this is not a classic he said, she said, where you only have the victim standing alone. Well, you're still saying it's harmless, aren't you? It's harmless. If there's error, it's not plain. And even if you get past there, this is a close question at best. So it's certainly not plain. The district court could. If they had objected at that point, the court would have held an in limine hearing and would have heard all the circumstances of the utterance and made a determination. Yes. So we don't really even know what all the circumstances of the utterance are. We would have to make that on under these facts. It's not an excited utterance. But we can't say whether you could have shown that or not. Correct, Your Honor. There certainly could have been other facts elicited if there was a sidebar in limine hearing. There are facts in the record, though, that do support it from the sister-in-law's testimony. We do know in the Ninth Circuit there has never been a case that ruled that an utterance was an excited utterance a day later. There is no authority in the Ninth Circuit. There's no authority for that time. And you will have to go to the Farley case. And the Farley case was different because it was a five-year-old, and we don't really know a lot of facts. There are not a lot of facts. There's not a lot of facts in Farley. So this would be a leap in terms of an excited utterance. But there are facts on this record that support it. She was 14. She'd just gone through a traumatic event. We're saying that she could have time to fabricate when she'd been drinking the night before. The effects of the alcohol were still there. This wasn't something that happened way after. The next day you have to take in context with the fact that she got home late. And then in response to questioning because, why was she questioned? She was upset. She was acting abnormal. We wanted to know. Another factor that the government finds important here is the defense started out their comments  And it's because there was no disclosure made to law enforcement. This girl had no motive to lie about the defendant. She was concerned about getting in trouble herself and going to juvenile detention because she'd been drinking. So she was putting the blame on herself. And she certainly didn't make a disclosure to law enforcement. But there is evidence in this record. One other point. The victim testified before the sister-in-law that she told the sister-in-law that she'd been raped the day before. So this is a cumulative statement at that because the victim had already said it. Oh, there was no objection that that was her say? No. There was no objection. And that was her saying it. She said, I said this. It's all her saying. It is an out-of-court statement, yes. I remember evidence. It could have been argued that it wasn't offered for the truth of the matter asserted, but simply that she made that statement. But no objection was made to put any of these offers of proof before the district court. But we have the victim here and the defendant's statement through the agent and through the tape that supports her. I don't think we have to make new law to resolve this case. I don't believe you do. You can look at this on plain error review and find that it's not plain or it didn't affect substantial rights, and that would settle the question as well. I think it's plain error because I don't think we have a case in the Ninth Circuit that would justify finding excited utterance when it's the day after. But I don't think it affected the substantial rights. That's what I was going to say. Then you have to move to the next question. And with the evidence in this case, I don't think that we can come to that conclusion here. All right, thank you. Thank you. Counsel, we'll give you a minute for rebuttal. Just real quickly, I guess, once again, I would just go back to the way I started my argument. It's not the government's fault that this case was in charge for two years, but that's a fact. And the case wasn't charged until two years later. It was strictly testimonial. There was no fault. So what difference does that make? What difference does it make that the case was charged two years later? What are you saying? I think it makes a difference with the court's prejudice analysis. For instance, was it in fact plain error when the hearsay testimony was admitted through the sister-in-law that served only to bolster the victim's testimony? Certainly the government used that in its closing argument. It's so classically hearsay that it would be the type of thing I would expect someone to scream up, just jump up and scream if they were concerned about it. I might have done that, Your Honor. As I say, I was not trial counsel. But obviously the jury knew that the time had elapsed and it still didn't bother them. We know that because they knew that. I suppose I would have from the reading of the indictment. But I guess the larger question is, is what effect would these trial errors have had on the jury's ultimate determination of guilt or innocence? So I do think that you've got to look at the – and that's what the cases say as well, the quantum of evidence and the procedural posture of the case, the evidentiary posture of the case. I was asked the question, too, about whether or not there's a case that talks about a district court's responsibility to ensure that the jury is giving opposing or contrary testimony when there is a readback or, in this case, a playback of the defendant's statement. And there is a Ninth Circuit case that talks about that to some extent. It's the United States v. Hernandez. I believe it's cited in the briefs. Would your argument be better if this had been a four-week trial and the testimony you wanted re-read had occurred on the first day and the testimony they asked for was on the last day and this was only a one-day trial? I think that cuts both ways, Your Honor. I think because it was such a short trial, I think there's a real good argument that the proper response should have been rely on your own memory and not given what turns out to be a very, very large part of the trial back to the jury. I think that there's a danger there that they will place undue emphasis on this particular statement. So I think that that cuts both ways. I have nothing. Counsel, thank you. Thank you to both counsel.
judges: Cudahy, Rawlinson, Callahan